ORIGINAL

CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|
| UNITED STATES OF AMERICA v. JULIO A. ALCARAZ and ISMAEL RODRIGUEZ aka "MAYO" | DOCKET NO. |
| | MAGISTRATE'S CASE NO. 00-0253M |

FILED CLERK, U.S. DISTRICT COURT JAN 27 2000 CENTRAL DISTRICT OF CALIFORNIA BY DEPUTY

CLERK US DISTRICT COURT ... 2000 CENTRAL DISTRICT OF CALIFORNIA BY DEPUTY

Complaint for violations of Title 21, United States Code § 846 and Title 18, United States Code § 924(c)

| NAME OF MAGISTRATE JUDGE | | LOCATION |
|---|---|---|
| HONORABLE STEPHEN J. HILLMAN | UNITED STATES MAGISTRATE JUDGE | Los Angeles, CA |

| DATE OF OFFENSE | PLACE OF OFFENSE | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|
| JANUARY 26, 2000 | Los Angeles County | |

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

On or about January 26, 2000, in Los Angeles County, within the Central District of California, defendants JULIO A. ALCARAZ and ISMAEL RODRIGUEZ aka "MAYO", conspired and agreed with each other to knowingly and intentionally possess with intent to distribute cocaine, a schedule II narcotic drug controlled substance, in violation of Title 21, United States Code, Section 846.

On or about January 26, 2000, in Los Angeles County, within the Central District of California, defendants JULIO A. ALCARAZ and ISMAEL RODRIGUEZ aka "MAYO", knowingly used and carried firearms, namely a, "Smith & Wesson 40 Caliber, Model 4006, Serial No. VCV5892" and a "Smith & Wesson, 38 Special, 5 Shot, 38 Caliber revolver", in violation of Title 18, United States Code Section 924(c), during and in relation to a drug trafficking crime, namely, conspiracy to possess with the intent to distribute cocaine in violation of Title 21, United States Code Section 846.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT DAVID JONES |
|---|---|
| | OFFICIAL TITLE Detective - Long Beach Police Department (LBPD) |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1) | DATE |
|---|---|
| [signature] | January 27, 2000 |

1) See Federal Rules of Criminal Procedure rules 3 and 54.

JMR:vb REC: Detention

ENTER ON ICMS FEB

**AFFIDAVIT**

I, David Jones, being duly sworn, hereby depose and say:

I.

INTRODUCTION

1. I am a Detective with the Long Beach Police Department (LBPD) and have been so employed since 1987. I am cross sworn as a United States Deputy Marshal, currently assigned to the Federal Bureau of Investigation (FBI) Metropolitan Violent Crimes Task Force. I have been involved in the investigation of numerous federal and state crimes with a focus on those that are violent in nature. I have developed significant expertise in the investigation of crimes such as narcotics trafficking, weapons violations, cargo theft, racketeering, kidnapping and bank robbery.

2. This affidavit is made in support of a complaint against JULIO ALVAREZ ALCARAZ and ISMAEL RODRIGUEZ (aka "MAYO") for violations of Title 21, United States Code, Section 846 (Conspiracy to Possess Cocaine with the Intent to Distribute), and Title 18, United States Code, Section 924(c) Carrying and Using a Firearm During and in Relation to a Drug Trafficking Offense).

3. This affidavit is also made in support of search warrants for the following premises:

LOCATIONS TO BE SEARCHED

a. 20812 Seine Avenue, Apt. D, Lakewood, California ("the premises"). The premises is further described as a multi-building, gated apartment complex located on the east side of Seine Avenue. Building number 20812 is located at the northwest end of the complex. It is a two-story, tan stucco building with four two-story units. The numbers "20812" appear in approximately 1" tall, light brown numbers on the west side of the building, facing Seine Avenue. Apartment "D" has a brown wooded door with decorative glass on top and an approximately 6" tall letter "D" centered below the glass. Apartment "D" is the eastern most unit of the building. 20812 SEINE AVE. #D, LAKEWOOD, CALIF.* 1/27/2000 DAJ

b. Long Beach Police Department Locker #137, located at 1835 Santa Fe Avenue, Long Beach Police Department, West Substation. Locker 137 is further described as a metal locker having a silver and black metal tag bearing the number "137" attached to the front. The locker dimensions are 23" x 70." The locker has a red metal door with a sloped top and gray trim. **

ITEMS TO BE SEIZED

4. The search will be for evidence of violations of Title 21, United States Code, Section 846 (Conspiracy to Possess Cocaine with the Intent to Distribute), and Title 18, United States Code, Section 924(c) (Carrying and Using a Firearm During and in Relation to a Drug Trafficking Offense), and the items to DAJ 1/27/2000

* HAS BEEN DETERMINED TO BE ALCARAZ' RESIDENCE THROUGH PHYSICAL SURVEILLANCE, UTILITY CHECKS, TELEPHONE COMPANY RECORDS, & STATEMENTS MADE BY ALCARAZ.

** LOCKER #137 HAS BEEN DETERMINED TO BE UNDER ALCARAZ'S CONTROL THROUGH A REVIEW OF LBPD INTERNAL DOCUMENTATION RELATING TO LOCKER ASSIGNMENTS AND THROUGH STATEMENTS MADE BY ALCARAZ.

be seized are:

a. United States and foreign currency derived from the sale of controlled substances;

b. Narcotics or money ledgers, narcotics distribution or customer lists, narcotics supplier lists, pay and owe sheets, records and other documents noting the price, quantity, dates, and/or times when narcotics were purchased, possessed, transferred, distributed, sold, and/or concealed;

c. Bank account records, wire transfer records, bank statements and records, money drafts, letters of credit, and safety deposit keys and records for the time period between January 1, 1997 to present, that reflect the money generated from the sale of narcotics;

d. Personal telephone and address books and listings, letters, cables, telegrams, photographs, audio and video tapes, and personal notes reflecting names, addresses, telephone numbers, communications, and illegal activities of associates in narcotics trafficking activities;

e. Financial instruments purchased with large amounts of currency derived from the sale of controlled substances, including travelers checks, bonds, stock certificates, money orders and cashiers checks, passbooks, bank checks, bank deposit tickets, certificates of deposit, and memoranda and other items showing evidence of the acquisition, secretion, transfer,

concealment, and/or expenditure of money;

f. Records, documents, and deeds reflecting the purchase of real estate, vehicles, precious metals, jewelry, or other items obtained with the proceeds of controlled substances for the time period from January 1, 1997 to present;

h. Handguns, shotguns, rifles, and any other firearms that are not registered or that are not registered in the name of occupants of the premises that may have been used to facilitate the distribution or possession of controlled substances with the intent to distribute said substances;

i. Any of the above listed documents and records pertaining to the distribution of controlled narcotics substances that are stored on computer hard drives, computer disks, computer tapes, computer equipment and peripherals, software to operate the computers and any related instruction manuals. As part of the aforementioned items, the searching agents will remove from the premises to be searched all computer hardware and related equipment, devices, disks, tapes, and other items, and all manuals or written information relating to the operation of computer hardware, software, and related equipment. Such computer hardware and related equipment to be removed from the premises are the following:

i. Computer hardware and computer-related equipment.

ii. Computer software and all other electronic, magnetic, or other media capable of being read or interpreted by a computer or its related components, and all information contained therein.

iii. Electronically stored communications.

iv. Computer passwords and other data security devices designed to restrict access to or hide computer software, documentation, or data.

v. Physical keys encryption devices and similar physical items that are necessary to gain access to computer programs, data, or other information, or otherwise to render programs or data into a readable or useable form.

vi. Computer-related documentation consisting of written, recorded, printed or electronically stored material which explains or illustrates how to configure or use computer hardware, software, or other related items.

k. The computer-related items specified herein will be returned after the evidence of crimes listed in paragraphs 4(a) through 4(f) of this affidavit is downloaded, recorded, deciphered, decoded, and/or copied by law enforcement authorities, but in any event no later than 30 days from execution of the search warrant.

5. The information contained in this affidavit is based upon information gained as a result of my personal participation

in this investigation since March 1997, telephone toll analyses, pen register analyses, electronic tracking device analyses, confidential reliable informants, cooperating witnesses, and oral and written reports supplied to me by Special Agents of the Federal Bureau of Investigation, as well as reports made available to me by other law enforcement officers, including agents of the State of California Bureau of Narcotics Enforcement ("BNE") and the Long Beach Police Department ("LBPD"). Having spoken with each witness, I believe the facts enumerated herein to be true and accurate, and the sources of that information to be reliable.

II

PROBABLE CAUSE

A. Historical Investigation

Overview

6. The known participants in the below described criminal activity include a LBPD officer (ALCARAZ) and several associates, including MAYO. Generally, their method of operation is that the associates pose as narcotics buyers and arrange for narcotics transactions to take place in the City of Long Beach. At the same time, they provide information surrounding the arranged transactions to ALCARAZ. Then, while on duty and in a marked patrol car, ALCARAZ intercedes before the narcotics transactions actually occur, and along with his associates, steals the

narcotics.

Chronology

7. The following chronological description of events is set forth solely for the purposes of this application for a complaint and search warrants, and is not exhaustive.

8. This investigation began when, on or about March 31, 1997, LBPD Deputy Chief Jerome Lance contacted F.B.I Supervisory Special Resident Agent (SSRA) Richard S. Hahn and told him the following:

a. The LBPD received what it believed to be credible information from various sources that drug trafficking activities were being conducted at various nightclubs in the Long Beach area and there was credible evidence implicating ALCARAZ in the aforementioned activities.

b. The LBPD wanted to conduct a joint LBPD/FBI investigation into these matters.

9. On April 3, 1997, the Los Angeles Division of the FBI opened an investigation regarding ALCARAZ' possible involvement in drug trafficking in the Long Beach area.

ALCARAZ RUNS LICENSE PLATE FOR CW-2

10. On September 14, 1999, I spoke with FBI SA Robert Scheerle Jr. I also reviewed FBI documents prepared by SA Scheerle regarding an interview he conducted with a cooperating

witness ("CW-2") on June 11, 1998.[1] Based on the above, I have learned the following:

a. On June 11, 1998, SA Scheerle met with CW-2 to prepare CW-2 for an anticipated meeting with ALCARAZ. SA Scheerle instructed CW-2 to arrange a meeting with ALCARAZ and tell him that CW-2 believed he (CW-2) was the subject of a law enforcement investigation and was being followed. CW-2 was further instructed to tell ALCARAZ that he wanted to determine if the car that had followed him was registered to a law enforcement agency.

b. SA Scheerle provided CW-2 with information regarding a 1995, white Chevrolet Suburban having California license plate number 3URY715.

c. ALCARAZ subsequently met with CW-2 for approximately one hour at Evans Restaurant located at the corner of Atlantic Avenue and Willow in Long Beach, California. FBI

---

1 Cooperating Witness-2 (CW-2) has provided reliable and accurate information regarding numerous investigations conducted by the FBI, DEA, and Los Angeles Police Department (LAPD). This information has been corroborated through independent investigation, including pen register information, telephone analyses, consensual recordings, financial documents, physical and electronic surveillance and independent interviews with sources unrelated to CW-2. CW-2 has been compensated in exchange for his cooperation with law enforcement. In a prior trial, CW-2 admitted having failed to pay taxes on income earned as a confidential witness. Regardless of any questions that may be raised by CW-2's failure to pay taxes, his statements as described in this affidavit are corroborated by law enforcement records including recorded meetings between he and ALCARAZ.

Special Agents maintained surveillance during this meeting. After the meeting, CW-2 was debriefed and provided the following information:

(i) CW-2 explained to ALCARAZ that CW-2 believed he (CW-2) was being followed, and that he was concerned that he was the subject of a law enforcement investigation.

(ii) ALCARAZ asked CW-2 about the vehicle following him, and CW-2 provided ALCARAZ with the description of the aforementioned car and license plate number.

d. A computerized search of the on duty unit history for the patrol car that ALCARAZ drove on June 11, 1998, revealed that ALCARAZ made a Justice Data Interface Controller (JDIC) inquiry on license plate number 3URY715 at 11:32 p.m.[2]

e. On June 13, 1998 at approximately 10:00 a.m., CW-2 called ALCARAZ' pager and shortly thereafter received a telephone call from ALCARAZ. ALCARAZ identified for CW-2 the registered owner of the Chevrolet, but told CW-2 that it was not possible to determine if the driver of the vehicle was law enforcement or someone else. However, ALCARAZ told CW-2 that if CW-2 observed the vehicle in the future, he should page him (ALCARAZ) and enter the code "911" and ALCARAZ would then attempt to further identify the occupants of the vehicle.

---

[2] JDIC is a general law enforcement data base which provides historical information about the car, including to whom the car is registered and whether the car is stolen.

ALCARAZ RUNS ANOTHER LICENSE PLATE FOR CW-2

11. On November 30, 1999, FBI SA Rogero, SA Scheerle, and I again met with CW-2 in preparation for an anticipated call between CW-2 and ALCARAZ. At approximately 11:50 p.m., CW-2 called ALCARAZ' pager and input his cellular telephone number. Approximately two minutes later, ALCARAZ, returned CW-2's page and a conversation ensued which I monitored and which was consensually recorded at the direction of the FBI. During that conversation, the following was said:

a. CW-2 told ALCARAZ that some people had stolen a lot of money from CW-2 and that he needed ALCARAZ to run a license plate. CW-2 added that on the day that CW-2 had suffered the theft, CW-2 heard that the same individuals who stole money from him had also stolen six kilograms of cocaine from another narcotics trafficker.

b. CW-2 then provided ALCARAZ with license number 2MUE999. A few seconds later, ALCARAZ told CW-2 that there was no return on the plate (meaning license plate on file). ALCARAZ then verified that he had the right license plate number and determined that he had mistakenly entered 2NUE999 rather than 2MUE999. After confirming the correct license plate number, a few more seconds past after which ALCARAZ told CW-2 that the registered owner of the vehicle was "Hector Torres" and that he lived in Woodland Hills.

c. CW-2 then offered to take ALCARAZ to dinner to thank him for running the license. ALCARAZ indicated that he was having significant financial problems, but did not want to accept CW-2's dinner invitation. CW-2 told ALCARAZ that the person who had stolen CW-2's money (Hector Torres) carried a lot of money and narcotics and he (ALCARAZ) could "rip" the subject. The conversation was concluded with an agreement that CW-2 would contact ALCARAZ the following day.

12. On December 1, 1999, I reviewed the Unit History report from the on-board computer in the patrol car assigned to ALCARAZ and determined that on November 30, 1999 at 11:53:04 and 11:53:51 p.m., ALCARAZ's made a JDIC inquiry on license plate numbers 2NUE999 and 2MUE999, respectively. Based on the time and nature of the JDIC inquiries, I believe they were made by ALCARAZ at CW-2's behest.

<u>ALCARAZ STEALS SIX KILOGRAMS OF COCAINE FROM AN UNDERCOVER BNE AGENT</u>

13. Based on information obtained by the joint task force, a portion of which is discussed above, the Honorable Carlos Moreno, United States District Judge, Central District of California, issued a Court Order authorizing the interception of wire communications to and from the following:

a. A cellular telephone currently assigned the number (562)547-3051, electronic serial number (ESN) 23513882508, issued

by AT&T Wireless, and subscribed to by JULIO A. ALCARAZ at 20812 Seine Avenue, Apt. D, Lakewood, California (hereinafter described as the "Target telephone"); and

b. A voice mail pager assigned number (562)499-7150, electronic capcode number 1664472, issued by Airtouch Paging subscribed to by JULIO A. ALCARAZ at 20812 Seine Avenue, Apt. D, Lakewood, California (hereinafter described as the "Target pager").

14. I have reviewed English language transcripts of the intercepted conversations[3], as well as BNE surviellance reports. I have also debriefed CW-2 in relation to his contacts with ALCARAZ. In doing so, I have learned that in response to several pages that CW-2 made to ALCARAZ' pager over several days, on January 12, 2000[4], at 3:58, p.m., ALCARAZ called CW-2. During their conversation, the following was said:

a. ALCARAZ identified himself by name and the two discussed what they had done on New Year's eve.

b. CW-2 then asked ALCARAZ whether he had heard any rumors about "those guys" (referring to the individuals, including "Hector Torres" indentified by CW-2 in a previous

---

[3] To the extent that I include quotations in discussing the substance of any conversations herein, the English phrase which most accurately captures the Spanish word was used and not in all cases a literal translation.

[4] All telephone communications discussed hereafter occurred during the 2000 calendar year unless otherwise noted.

conversation with ALCARAZ as individuals who stole narcotics from CW-2).

c. ALCARAZ said he had not heard any rumors, and that "they" (referring to people associated with ALCARAZ) went to the location to see if they could see Hector Torres' car at the address. ALCARAZ further stated that they did not see the car, so they didn't "want to hit the house and find nothing".

d. CW-2 then referred to individuals who stole his narcotics and said that a friend of his (CW-2) told him that they (the individuals who stole CW-2's narcotics) wanted to "do a deal" with CW-2's friend.

15. On January 25, ALCARAZ called CW-2 in response to a page and the following conversation occurred:

a. ALCARAZ identified himself by his first name and apologized for not returning CW-2' page indicating that the circuits were busy when he tried to do so.

b. CW-2 said that he had been contacted by Hector Torres' brother-in-law to do a deal, and CW-2 had agreed.

c. CW-2 further told ALCARAZ that he (CW-2) did not actually want to do the deal, which he said was for "six keys" (meaning six kilograms of cocaine), but asked ALCARAZ if he would "turn up there" (meaning he wanted ALCARAZ to intercept the trafficker before the deal went down and steal the drugs from the trafficker).

    d.   CW-2 further explained that the trafficker wanted to do the deal that same day, but CW-2 told him no.

    e.   CW-2 asked ALCARAZ what to do.

    f.   ALCARAZ asked if the trafficker was connected to the individuals who had previously ripped-off CW-2, and CW-2 said he was.

    g.   ALCARAZ said he would participate, and asked if the deal could be arrange for the following morning.

    h.   CW-2 said he could arrange it for when ALCARAZ wanted to.

    i.   ALCARAZ said "it's better when I'm, in the patrol car, when I'm working, you understand? . . . To drop on them"

    j.   CW-2 then asked when was the latest the following morning that ALCARAZ could have the patrol car and ALCARAZ said "11:00 a.m., at the latest."[5]

    k.   CW-2 then confirmed with ALCARAZ that he was going to be working the following night (January 26) starting at 10:00 p.m., and that he (CW-2) would call ALCARAZ when he knew where and when the deal would take place.

    l.   ALCARAZ suggested that the deal be done in the parking lot of the Norm's Restaurant in Long Beach where the two

---

    [5]   I am aware that ALCARAZ's shift would have normally ended at 8:00 a.m.  However, because of the manner in which LBPD maintain's its patrol cars, ALCARAZ would still have had access to a LBPD patrol car after his shift ended.

had eaten before, and CW-2 said he would contact ALCARAZ the following morning to confirm the details of the deal.

16. On January 26, at 9:29 a.m., ALCARAZ called CW-2 and CW-2 explained that he had not called ALCARAZ because the traffickers were not able to do the deal that morning, but that the deal could be done later that day. ALCARAZ asked if the deal could be done at 10:30 p.m. CW-2 said it could, and that the deal would done at the place they had agreed to (the parking lot at Norm's restaurant) and that he would contact ALCARAZ at 10:00 p.m., to confirm the final arrangements.

17. On January 26, at 9:37 p.m., ALCARAZ called CW-2 and told him that he (ALCARAZ) was about to go to work. CW-2 explained to ALCARAZ that the trafficker did not want to do the deal where ALCARAZ had suggested. ALCARAZ then suggested the parking lot of the Ralphs supermarket located on Willow Street near Santa Fe Avenue in Long Beach (the "Ralph's parking lot") as an alternate location. CW-2 told ALCARAZ that the Ralphs parking lot was acceptable. CW-2 also re-confirmed that the trafficker would have "six keys", and that he would call him (ALCARAZ) at 10:30 p.m.

18. At approximately 11:00 p.m., an undercover BNE agent ("the UC") wearing a cowboy hat and driving a white Jeep Cherokee with no license plate, and six kilograms of cocaine in a black suitcase located in the trunk area, drove to Webers Bakery at

3636 Sante Fe Avenue.

19. At 11:28 p.m., CW-2 called ALCARAZ' cellular telephone and spoke with him. During the conversation, CW-2 told ALCARAZ that the guy was at Wardlow and Santa Fe, near the Weber's Bakery. CW-2 also told ALCARAZ that he (CW-2) had just driven by that location and the trafficker was in the parking lot in a white Cherokee, wearing a cowboy hat. In response, ALCARAZ indicated he was on his way to the location.

20. Based on my conversation with the UC and my having reviewed a video tape of the incident, I learned the following:

a. At approximately 11:30 p.m., the UC observed a Long Beach Police Department Patrol car enter the Weber's bakery parking lot and drove directly toward him.

b. The Long Beach Police Officer put his car spot-light on the UC. The officer asked the UC if the UC had any weapons, and the UC said he did not. The officer then got out of his patrol car and orderd the UC to walk back to the patrol car and to put his hands over his head. At that point, the UC could see the officer's face, and recognized it from a photograph previously shown to him as that of ALCARAZ. The UC could also see that ALCARAZ had unholstered his weapon (A SMITH & WESSON .40 CALIBER. MOD. 4006 #VCV5892) and was holding it at his side. The UC complied with ALCARAZ' instructions. ALCARAZ then order the UC to turn around and put his hands behind his head. After the UC complied, ALCARAZ conducted a pat down

1/27/2000 DAS

search.

c. ALCARAZ then asked the UC if he would consent to having the car searched, and the UC did not respond. ALCARAZ then asked the UC for the keys to the car and the UC complied. ALCARAZ, with the keys in hand, walked directly to the rear of the jeep and opened the trunk. ALCARAZ opened the suitcase stored in the trunk, and looked inside. Thereafter, ALCARAZ closed the suitcase, took it out of the trunk, and placed it in the rear seat of his patrol car.

d. ALCARAZ then re-approached the Jeep and conducted a further visual search while continuing to question the UC regarding his place of residence and his lack of identification. ALCARAZ then approached the UC and said something to the effect that he was going to give the UC a chance and allow him to leave. The UC then thanked ALCARAZ, got in the Jeep, and drove away from the location.

e. At 11:43 p.m., ALCARAZ called CW-2 and asked him if he wanted to sell "them" (referring to the six kilograms of cocaine), or if he wanted ALCARAZ to take care of it. CW-2 told ALCARAZ he (CW-2) wanted ALCARAZ to take care of it, and just give him (CW-2) some money. ALCARAZ agreed to take care of the sale.

f. At 11:48 p.m., ALCARAZ received a call on his cellular telephone and spoke with an individual subsequently

identified as MAYO. ALCARAZ told MAYO that he was working and that he had a "present", "six of those things" (referring to the six kilograms of cocaine). However before the conversation was completed it was disconnected.

g. At 12:02 a.m., on January 27, ALCARAZ received another incoming call on his cellular telephone from MAYO. MAYO asked ALCARAZ for ALCARAZ' location, and ALCARAZ said he was on Wardlow and Santa Fe. MAYO responded that he was at the Bonanza Restaurant, at which time, ALCARAZ told him to go to where he "left the car," behind the donut shop.[6]

h. BNE surviellance agents then observed MAYO drive his car to Angel's donut shop near the intersection of Wardlow and Santa Fe. There, MAYO parked next to ALCARAZ' patrol car, which was already at the donut shop. MAYO and ALCARAZ got out of their cars, approached each other, and had a brief discussion. ALCARAZ then opened the left rear door of his patrol car, removed the suitcase, and handed it to MAYO. MAYO took the suitcase and put it in the rear seat of his car. He then got into his car and, after an additional brief conversation with ALCARAZ pulled out of the parking lot north bound on Santa Fe.

i. At the intersection of the 710 and 91 freeways, a

---

[6] At the point at which this call occurred, there were BNE surviellance officers who observed MAYO using a pay phone in the Bonanza parking lot standing in front of a white Ford Expedition license plate 4DZT-429which is registered to Sergio Rodriguez, MAYO's brother (hereinafter "MAYO's car").

marked LBPD patrol car initiated a traffic stop of MAYO's vehicle by activating its lights and siren. Initially, MAYO pulled to the shoulder near Compton Boulevard, at which point commands were issued in both English and Spanish for him to get out of the car and surrender. In response, MAYO sped off north-bound on the 710 freeway, before exiting at Rosecrans.

j. After an extensive pursuit, during which the speeds exceeded 90 miles, MAYO pulled to the curb at 118th Place and Alabama street in the City of Los Angeles, got out of the car and ultimately was apprehended at 120 Street and Alabama.

k. BNE agents who were participating in the pursuit observed the suitcase lying in the traffic lanes of Rosecrans and Butler (consistent with the direction of the pursuit) and the suitcase and its contents (six kilograms of cocaine) were recovered.

l. During the course of the pursuit, a dispatch was issued to ALCARAZ requesting that he return to the downtown station to transport a female prisoner. After initially failing to acknowledge the dispatch, ALCARAZ took a circuitous route back to the station, where he was taken into custody at 12:45 a.m.

III

AGENT'S EXPERTISE

21. Based on my training and experience, and on my conversations with officers who have participated in

investigations involving large amounts of controlled substances, I know the following:

a. Narcotics traffickers (hereinafter "traffickers") often place assets in names other than their own, to avoid detection of these assets by government agencies;

b. Even though those assets are in names of other persons, the traffickers continue to use those assets and exercise dominion and control over them;

c. Traffickers must maintain, on hand, large amounts of United States currency in order to maintain and finance their ongoing drug business;

d. Traffickers maintain books, records, customer lists, receipts, notes, ledgers, and other papers relating to the transportation, ordering, sale, and distribution of controlled substances and equipment, even though such documents may be in code. Traffickers commonly "front" drugs to their customers. The aforementioned books, records, receipts, notes, ledgers, etc., are commonly maintained where the drug traffickers have ready access to them, i.e., homes, offices, and automobiles.

e. Traffickers frequently rent OR USE PERSONAL storage lockers to store controlled substances, and often have in their immediate possession or in their residences, keys, receipts, and other documents evidencing the rental of said storage lockers; DAJ 1/27/2000

f. Traffickers commonly maintain in their residences

books or papers that reflect names, addresses, and/or telephone numbers for their associates in the drug trafficking organization, even if said items are in code;

g. Traffickers often store information regarding their drug trafficking on computer databases.

h. Traffickers frequently take, or cause to be taken, photographs of themselves, their associates, their property, and their product, and usually maintain these photographs in their residences;

i. Traffickers often launder money obtained through illegal drug transactions through legitimate businesses. Traffickers who are involved in such money laundering often structure financial transactions to avoid reporting requirements, and often keep records of their activities and financial transactions. However, to escape detection, they mix and intermingle those records with records of lawful transactions. Therefore, it is necessary to analyze the entire record to isolate the unlawful transactions, and not feasible to extract the records of unlawful activities without such analysis;

j. Traffickers and persons involved in manufacturing, distributing, sorting, and possession of controlled substances frequently possess on their person or in their residence guns, and other weapons, both legal and illegal, to protect their person, drugs, or proceeds of drug transactions from theft by

other persons or seizure by law enforcement.

j. Traffickers usually keep paraphernalia for manufacturing, packaging, cutting, weighing, and distributing controlled substances and such paraphernalia usually includes bottles, scales, plastic bags, heat sealers, glassware, chemicals, mechanical stirrers, and heat resources.

k. Various chemical residues and contamination can usually be found at the traffickers storage and manufacturing sites;

l. Unexplained wealth is probative evidence of crimes motivated by greed, in particular, trafficking in controlled substances;

m. The trafficker keeps receipts of his illegal activities for a period of time extending beyond the time during which he actually possesses illegal controlled substances, so that he can maintain contact with his criminal associates for future drug transactions, and so that he can have records of prior transactions for which, for example, he might still be owed money or might owe someone else money.

n. A trafficker who is responsible for the distribution of large amounts of controlled substances has developed relationships with suppliers and distributors of controlled substances. It is consistent with a trafficker who is able to distribute large amounts of controlled substances to have

been in the business of distributing narcotics for several years preceding the start of an investigation. Consequently, that trafficker will often possess documents relating to his/her trafficking that were created/generated several years before an investigation began.

V

CONCLUSION

22. Based upon the foregoing information, there is probable cause to believe that JULIO ALVAREZ ALCARAZ and ISMAEL RODRIGUEZ (aka MAYO) have committed violations of 21 U.S.C. § 846 (Conspiracy to Possess Cocaine with the Intent to Distribute), and 18 U.S.C. § 924(c) (Carrying and Using a Firearm During and In Relation to a Drug Trafficking Offense). Based upon the foregoing information, there is also probable cause to believe that the items listed in paragraph 4 above will be found at the premises located at: (1) 20812 Seine Avenue, Apartment D, Lakewood, California; and (2) Long Beach Police Department, West

Substation Locker #137, and that these items are evidence of violations of Title 21, United States Code, Section 846 and Title 18, United States Code, Section 924(c).

David Jones
Deputy United States Marshal

Subscribed and sworn before me on this 27, of January, 2000.

UNITED STATES MAGISTRATE JUDGE